IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHANBUNTHAIT PROEUNG,

    Petitioner,　　　　　　　　No. CIV S-02-0626 GEB JFM P

   vs.

GEORGE M. GALAZA, Warden,　　　ORDER AND

    Respondent.　　　　　　　　FINDINGS AND RECOMMENDATIONS
_____/

        Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1999 conviction on charges of first degree residential robbery in concert, rape in concert, first degree burglary and assault by means of force likely to produce great bodily injury or with a deadly weapon and the sentence of life plus three years with a minimum of 15 years imposed thereon. Petitioner raises claims of ineffective assistance of trial counsel and contends appellate counsel was also ineffective for failing to raise ineffective assistance of counsel claims on direct appeal.

        On August 8, 2003, petitioner filed a motion to supplement his application with exhibits and declarations in support of his petition. Good cause appearing, this court will construe petitioner's August 8, 2003 motion as his traverse and deem it timely filed.

1

FACTS[1]

At approximately 1:00 a.m. on March 30, 1998, five men, later identified as Neth Seng, Sopee Khen, Chittra Mom, Chanthoeurn Chhuon, and [petitioner], broke into an apartment on Fontana Avenue in Stockton and committed various offenses against the inhabitants. All of the men were wearing white rags over their faces. Present in the apartment at the time of the home invasion were a man and his wife, their son, D., their daughter, K., K.'s boyfriend, H., and K.'s two children.

The perpetrators arrived at the apartment in a white Honda, with [petitioner] driving. [Petitioner] and Chhuon got out and went to the front door. [Petitioner] kicked the door open and entered, while Chhuon came back for the others. At the time of the home invasion, K. and H. were asleep in one bedroom and D. was asleep in another. The others were asleep in the living room.

K. and H. were awakened by the sound of the front door breaking open. K. opened the bedroom door to investigate and one of the men pointed a gun at her. The man pulled her into the hall where another man took her necklace and bracelets. The first man entered the bedroom, pointed the gun at H. and took his necklace. K. and H. were ordered into the living room, where H. was directed to lie down on the floor.

Meanwhile, two of the other men broke open the door to D.'s bedroom. One of them pointed a gun at D. and ordered him into the living room. Two rings and a necklace were taken from him. D. could hear the men searching through his and his sister's bedrooms and saw them bring items into the living room. D.'s watch was taken, along with H.'s watch and wallet.

D. was ordered to lie face down on the floor. One of the men grabbed K. and laid her on her back on the floor next to D. Two of the men put their fingers in K.'s vagina. One of them, later determined to be [petitioner], stood up and unzipped his pants, while the other pointed a gun at K. and told her to be quiet and not move. [Petitioner] then laid on top of K. and had sexual intercourse with her while the other man held her legs. K. cried and told them to stop. During the rape, one of the men asked D. about money and D. said he did not have any. D. was struck in the forehead with a gun.

At 1:22 a.m., Stockton Police Officers Perez and Marconi were dispatched to the apartment to investigate a possible robbery.

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Proeung, No. C032298 (June 23, 2000), a copy of which is attached as Exhibit #C to Respondent's Answer, filed March 3, 2003.

They arrived a minute later, approached the door and heard "screaming inside." Perez knocked and announced "Police." One of the perpetrators looked out a window and informed the others that the police had arrived. The men ran out a sliding glass door in D.'s bedroom, while one of the victims opened the door for the police.

Three of the men, Neth Seng, Chittra Mom, and Chanthoeurn Chhuon were apprehended shortly thereafter, and various items taken in the home invasion were recovered. Seng and Mom provided information to the police which suggested [petitioner] was involved in the crimes. [Petitioner] was interviewed the next day and gave his name as Khun Sovann and his address as a residence which the police knew to be a vacant home.[2] [Petitioner] was arrested. A comparison of the DNA from sperm taken from K.'s vagina with blood samples from [petitioner] and the other suspects produced a match with [petitioner].[3]

(People v. Proeung, slip op. at 2-5.)

ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

>  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly

---

[2] Khen was never apprehended. The authories were informed he left town after the home invasion.

[3] Chittra Mom, Seng Neth and Chanthoeurn Chhuon were jointly charged with the same offenses petitioner was ultimately convicted of committing. (People v. Proeung, slip op. at 4.) Chittra Mom was convicted of all four offenses and sentenced to state prison for an indeterminate term of 25 years to life. Neth Seng entered a negotiated plea which provided for a state prison sentence of six years in exchange for his testimony against the remaining defendants. Chanthoeurn Chhuon was convicted of the four offenses and sentenced to state prison for 10 years." (People v. Proeung, slip op. at 5.)

established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

II. Petitioner's Claims

A. Claim One

Petitioner raises five allegations of ineffective assistance of trial counsel claiming that trial counsel did not adequately investigate and prepare for petitioner's suppression hearing because he failed to: (1) contact and interview critical defense witnesses; (2) investigate and locate other potential witnesses at and near the arrest location; (3) interview or investigate any of

/////

4

1  the prosecution witnesses; (4) subpoena the critical defense witnesses to testify at the suppression
2  hearing; and (5) ask the court for a continuance to secure the witnesses' attendance.

3  These claims were not presented in petitioner's direct appeal. Petitioner presented
4  these claims in a petition for review in the California Supreme Court. (Respondent's Answer,
5  Ex. F.) The California Supreme Court denied the petition without comment on January 29, 2002.
6  (Respondent's Answer, Ex. G.) Because there is no reasoned state court opinion to which
7  deference is owed, this court has independently reviewed the record. Delgado v. Lewis, 223 F.3d
8  976, 982 (9th Cir. 2000).

9  The Sixth Amendment guarantees the effective assistance of counsel. The United
10  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in
11  Strickland v. Washington, 466 U.S. 668 (1984). To support a claim of ineffective assistance of
12  counsel, a petitioner must first show that, considering all the circumstances, counsel's
13  performance fell below an objective standard of reasonableness. Id. at 687-88. After a petitioner
14  identifies the acts or omissions that are alleged not to have been the result of reasonable
15  professional judgment, the court must determine whether, in light of all the circumstances, the
16  identified acts or omissions were outside the wide range of professionally, competent assistance.
17  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003). In assessing an ineffective assistance of
18  counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide
19  range of professional assistance.'" Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting
20  Strickland, 466 U.S. at 689). There is in addition a strong presumption that counsel "exercised
21  acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d
22  695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

23  Second, a petitioner must establish that he was prejudiced by counsel's deficient
24  performance. Strickland, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable
25  probability that, but for counsel's unprofessional errors, the result of the proceeding would have
26  been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine

5

confidence in the outcome." Id. See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. It has been recognized that "the adversarial process will not function normally unless the defense team has done a proper investigation." Siripongs v. Calderon (Siripongs II), 133 F.3d 732, 734 (9th Cir. 1998)(citing Kimmelman, 477 U.S. at 384). Therefore, counsel must, "at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and quotations omitted). On the other hand, where an attorney has consciously decided not to conduct further investigation because of reasonable tactical evaluations, his or her performance is not constitutionally deficient. See Siripongs II, 133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995). "A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'" Wiggins, 539 U.S. at 533 (quoting Strickland, 466 U.S. at 691). See also Kimmelman, 477 U.S. at 385 (counsel "neither investigated, nor made a reasonable decision not to investigate"); Babbitt, 151 F.3d at 1173-74. A reviewing court must "examine the reasonableness of counsel's conduct 'as of the time of counsel's conduct.'" United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690). Furthermore, "'ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.'" Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (quoting Eggleston

1  v. United States, 798 F.2d 374, 376 (9th Cir. 1986)).  See also Hayes v. Woodford, 301 F.3d
2  1054, 1070 (9th Cir. 2002).

3      The trial court denied defense counsel's motion to suppress as follows:

> I think the focus in this case needs to be placed on who the robbers are, not necessarily who the rapist is.  Once the focus gets in place that way, I think it's easier to analyze the material that we have.
>
> What we knew, or what the officers knew by the time the defendant was taken away from – after Seraypheap had gone out there, what they knew then was that they had had a home invasion robbery involving some sexual acts with five suspects, all of them wearing masks, according to Officer Seraypheap's testimony, that they came in a white Honda because that was found outside.  The Honda owner was talked to, according to Seraypheap, and he placed the Honda in the hands of Sokda But and his friend Ted, according to the Honda owner, Mr. Norng, and he indicated that this Ted was staying at Sokda But's house.
>
> And Mom gives his statement as to who had done the rape.  And he may be wrong about who did the rape.  He may have been lying about who did the rape.  He may have just been trying to save his own skin, but certainly there were other people left – there were other people left to be identified.  To the extent the officers could get anybody to mention anybody's names, it might be to the good if it was corroborated.  Mom said Ted was living with Sokda But and was from out of town.  That's corroborated by Norng.
>
> So at that point I think it's fair that the officers – they not only – they weren't being given information from the informants that some crime had happened and the only people that were giving the information the crime had happened were the informants themselves.  They had other robbery information basically.  Just the corroboration came first.
>
> They didn't necessarily have to believe the victim when she identified Mom and the others and their role in the matter.  It was fairly obvious from the circumstances that those three people who were arrested were involved by their own admissions.  The officers go out to the scene and I think there is a credibility issue there and I think the officers found the defendant at Sokda But's house.  There is some dispute about it and there is some concern about the matters not in the reports.  That also corroborates the information that Norng had provided, that Mom had provided with regard to the relationship of Ted with Sokda But.
>
> Then the defendant lies about his arrest.  And I think at that point, in my opinion, the officers had probable cause to arrest the

> defendant for the home invasion robbery.  Now, there may still have been some concern about whether or not he was the one who actually committed the rape, but I think they've got probable cause to believe that the defendant Sovann was involved in a home invasion robbery by virtue of the statements, and I think of the participants, as well as the facts that they had from other sources.
>
> So the Court finds that there was probable cause to arrest, they could take the defendant down [to] the station, they could question him until he decided not to answer any further questions and that that evidence is admissible.  So the motion to suppress is denied.

(RT at 322-24.)

All of petitioner's ineffective assistance of counsel claims pertain to his contention that had trial counsel taken the steps petitioner claims counsel should have, the motion to suppress would have been granted.  Petitioner has now presented a declaration from Sokda But who declares under penalty of perjury that she and petitioner were in Mr. Mao's residence at 2750 Pixie Drive on March 30, 1998.  (August 8, 2003 Traverse, Ex. C.)  She denied identifying petitioner as "Ted."  (Id.)  He has also provided a declaration by Sophea Chey, who declares under penalty of perjury that she was in her house at 2914 Pixie Drive on March 30, 1998 between the hours of 3:00 p.m. to 6:00 p.m. and that petitioner was not at her house during that time.  (August 8, 2003 Traverse, Ex. D.)  Ms. Chey acknowledges that her brother-in-law Map Norng was taken in for questioning during those hours.  (Id.)  Ms. Chey also denied identifying petitioner as "Ted."  (Id.)  Petitioner has provided a declaration by Sokphern But who declares under penalty of perjury that she was home at 2914 Pixie Drive on March 30, 1998 from 3:00 p.m. to 6:00 p.m. and petitioner was neither present nor arrested at her home during that time, but her husband Map Norng was taken in for questioning during that time frame.  (Id.)

Petitioner argues these witnesses would have contradicted police officers' statements about the location and manner of the arrest.  However, as respondent noted, the location where petitioner was located and questioned was not significant because petitioner consented to the initial questioning by Detective Seraypheap.  The Fourth Amendment is not

8

offended by consensual encounters with law enforcement. Florida v. Bostick, 501 U.S. 429, 434 (1991). In addition, petitioner could not challenge the search of someone else's home because he lacked standing to do so. Rakas v. Illinois, 439 U.S. 128, 133 (1978). Therefore, even if these three witnesses had been subpoenaed and testified that petitioner was located at a different address than the address provided by the police officers and confirmed that the officers entered the home without permission and found petitioner there, the outcome of the suppression hearing would not have been different, thus failing to meet the prejudice prong of Strickland.

These witnesses' testimony concerning whether or not they identified petitioner as "Ted" is equally unavailing. Officer Seraypheap testified that Neth Seng told him that he had been living with a person named Kda and Ted at 2914 Pixie Drive. (RT at 196.) Officer Seraypheap testified that defendant Mom told him that Mom and his friends were drinking inside a court on Pixie Drive and got into a white Honda and drove to Fontana and committed a robbery. (RT at 197.) The officer testified that Mom told him that Ted raped the woman during the robbery. (RT at 197.) Officer Seraypheap testified that both Neth and Mom described the house. (RT at 197.) Officer Seraypheap stated he checked the name in his computer for Ted and found two matches, one for a person named Chanbuthait Proeung and one for Sokda Butt. (RT 198.) Officer Seraypheap testified that when he went to 2914 Pixie Drive, Sokda Butt's address, he spoke with Sokda Butt's sister, Sopee, who told him a Ted lived there. (RT 199.) Officer Seraypheap testified he also spoke with Map Norng who said he let Ted drive Norng's white Honda. (RT 199-200.) Officer Seraypheap testified that Norng told him Ted had the white Honda at that time. (RT 202.) The white Honda had been found outside the robbery scene, 2150 Fontana, with a T-shirt cut-up into bandanna-type masks. (RT 200.)

Officer Seraypheap testified that around 4:00 p.m., after he returned to Pixie Drive, two other officers had Sokda Butt and another person in the back of their patrol cards. (RT 205-06.) Officer Seraypheap testified the other person identified himself as Khun Sovann, but when he asked Sopee Butt whether Khun was "Ted," who had been living with Sokda Butt at

9

the house, Sopee told the officer "[t]hat's him." (RT 207.) Officer Seraypheap recounted his probable cause to arrest petitioner was the information he received from Chittra Mom, Ted's name and the fact Ted was living with Ricky Neth and Sokda Butt at 2914, and Sopee's confirmation that Ted was living there. (RT 238.)

Officer Kohler testified that as he entered the house a subject was coming down the stairs and he knew it was "Ted" from "contacting him about a few days ago." (RT 244.) He asked Ted, "Are you Ted?" and Ted said "yeah." (RT 244.) Officer Kohler said he recalled seeing Ted previously because Ted had been wearing a bright yellow jacket and claimed to have come here from Massachusetts, which was unusual. (RT 244.)

Although Sokda But and Sophia Chey now claim they would have testified that they did not identify petitioner as "Ted," their testimony would be contradicted by the two law enforcement officers who testified that they did identify petitioner as "Ted." And, unlike the law enforcement officers who had no apparent motive to lie, petitioner was living with these two witnesses at the time, so the prosecution could attack their credibility.[4] At the suppression hearing, petitioner confirmed he goes by the name "Ted." (RT 286.)[5] In light of the testimony at the suppression hearing, it is unlikely that the testimony offered in petitioner's supplemental declarations would have changed the outcome of the suppression hearing.

For all of the foregoing reasons, petitioner has made no showing that the arresting officer lacked probable cause to support petitioner's arrest. Petitioner has failed to demonstrate that there was a reasonable probability that the outcome of the suppression hearing would have been different had his lawyer taken any or all of the steps petitioner suggested. Thus, the state

---

[4] There is a suggestion in the record that the prosecution was prepared to attack the credibility of "Sopee But" [sic] who was initially prepared to testify on behalf of petitioner but, after Detective Seraypheap contacted her on November 17, 1998, and the defense investigator contacted her the morning of November 18, she apparently said she "didn't want to be here, she's under age and her mother said she didn't want to be there." (RT 277.) The district attorney stated he was prepared to impeach her if she took the stand. (RT 301.)

[5] Neth Seng also identified petitioner as "Ted" at trial. (RT 864.)

court's rejection of petitioner's first claim for relief was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent. Petitioner's first claim for relief should be denied.

B. <u>Second Claim</u>

Petitioner's second claim is that he suffered ineffective assistance of appellate counsel because appellate counsel failed to raise a claim of ineffective assistance of trial counsel on direct appeal.[6]

Petitioner presented this claim in a petition for review in the California Supreme Court. (Respondent's Answer, Ex. F.) The California Supreme Court denied the petition without comment on January 29, 2002. (Respondent's Answer, Ex. G.) Because there is no reasoned state court opinion to which deference is owed, this court has independently reviewed the record. <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000).

The <u>Strickland</u> standards apply to appellate counsel as well as trial counsel. <u>Smith v. Murray</u>, 477 U.S. 527, 535-36 (1986); <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983). Counsel "must be allowed to decide what issues are to be pressed." <u>Id.</u> Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." <u>Id.</u> <u>See</u> also <u>Smith v. Stewart</u>, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.") There is, of course, no obligation to raise meritless arguments on a client's behalf. <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88 (requiring a

---

[6] Petitioner also claims appellate counsel failed to file a habeas petition on petitioner's behalf. However, habeas petitions are collateral to the criminal appeals process. Petitioner's appellate counsel was therefore not responsible for filing a habeas petition on petitioner's behalf.

11

showing of deficient performance as well as prejudice). Thus, counsel is not deficient for failing to raise a weak issue. See Miller, 882 F.2d at 1434. In order to demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. Miller, 882 F.2d at 1434, n.9.

Petitioner has failed to demonstrate either incompetence or prejudice with respect to this claim. Appellate counsel's decision to reject a claim of ineffective assistance of trial counsel and to press only claims with more merit was "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 771 (1970). Petitioner has failed to show he would have prevailed on appeal had her counsel properly preserved the ineffective assistance of counsel issue. Further, as discussed above, a claim of ineffective assistance of trial counsel lacks merit.

The state court's rejection of petitioner's second claim for relief was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent. Petitioner's second claim for relief should be denied.

IT IS HEREBY ORDERED that petitioner's August 8, 2003 motion to supplement is construed as petitioner's traverse and is deemed timely filed; The Clerk of the Court shall edit the docket entry to so reflect.

IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised

/////

1  that failure to file objections within the specified time may waive the right to appeal the District
2  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
3  DATED: January 13, 2006.

UNITED STATES MAGISTRATE JUDGE

/001;proe0626.157